IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 10-703 |
| v. | : | |
| NATHANIEL PITTS, | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         MARCH 15, 2011

## I.   INTRODUCTION

Defendant Nathaniel Pitts ("Defendant" or "Pitts") was charged in a five count indictment with three counts of knowingly and intentionally possessing with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); one count of knowingly possessing a firearm and ammunition in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and one count of having been convicted of a crime punishable by imprisonment for a term exceeding one year and knowingly possessing a firearm, in violation of 18 U.S.C. § 922(g)(1).

1

Defendant filed a motion to suppress all physical evidence obtained from a search of his GMC Envoy, his house, his bank account, a black Infiniti M45 registered to the Defendant at his home address, and a Volkswagen Jetta registered to Pitts Automotive LLC.  Defendant argues that this evidence stems from an illegal seizure of his person and his GMC Envoy; therefore, all evidence should be suppressed as fruit of the poisonous tree. The Government opposes the motion arguing that law enforcement officers were justified in seizing Defendant and his GMC Envoy for approximately two hours because they had probable cause to believe Defendant was engaged in illegal activity or, in the alternative, they initially had reasonable suspicion which elevated into probable cause.

For the reasons set forth below, the Court will deny Defendant's motion to suppress all physical evidence.

**II.  BACKGROUND**

On September 13, 2010, Drug Enforcement Task Force Officer Oswaldo Toledo ("Agent Toledo") and other officers conducted surveillance on Defendant.  (Hearing 16:12-14.)  This surveillance was prompted by information received from a confidential informant who indicated that Defendant was drug trafficking in Philadelphia.  (Id. at 18:8-18.)  Agent Toledo testified that this informant described the vehicles Defendant

was operating, the location of hidden compartments in the vehicles, the location of Defendant's residence, and the fact that Defendant previously did federal time for drug trafficking. (Id. at 19:18-25; 21:5-25.)  Agent Toledo testified that he relied on this informant because the informant previously provided reliable information, and Agent Toledo was able to corroborate the information provided by the informant.  (Id. at 19:1-16.)

On the day of the search, the surveillance was coordinated by an air wing unit.  (Id. at 17:9-16.)  At 3:00 p.m. officers observed Defendant arrive at his residence in one of the vehicles described by the informant—a GMC Envoy.  (Id. at 22:15-20.)  Defendant then entered his residence, but he exited fifteen minutes later and changed the battery in a white Volkswagen Jetta.  (Id. at 23:1-6; 43:10-12; 44:10-18.)  Once the battery was changed, Defendant entered his GMC Envoy, "circled the block," and parked the GMC Envoy directly across from his residence.  (Id. at 23:7-12.)  At the hearing, Agent Toledo explained that "circling the block" is a "counter-surveillance technique that a lot of drug traffickers use to identify if any law enforcement officers are conducting surveillance on them." (Id. at 23:8-12.)

After Defendant parked his GMC Envoy in front of his home, he entered his house.  (Id. at 23:19-20.)  On a couple

3

occasions, Defendant was observed exiting his house, looking around, and going back into his house. (Id. at 53:2-5.) At one point, Defendant exited his house and entered his GMC Envoy. (Id. at 56:1-5.) Surveillance followed Defendant to a Deals parking lot. (Id. at 24:5-8.) Once at the parking lot, a black SUV parked behind Defendant. (Id. at 24:14-20.) The driver of the black SUV exited the SUV and went to the passenger side of Defendant's GMC Envoy. (Id. at 24:17-20.) The driver of the SUV and Defendant were in the GMC Envoy for approximately sixteen minutes. (Id.) The driver of the SUV then exited the GMC Envoy and went back into his car. At this point, Defendant and the driver of the SUV simultaneously exited the parking lot and went in separate directions. (Id. at 25:1-2.)

Once the cars exited the Deals parking lot, at approximately 5:15 p.m., Agent Toledo contacted Philadelphia Police and requested that the black SUV and Defendant's vehicle be stopped. (Id. at 25:12-14.) Defendant stopped, but the black SUV led the officers on a high-speed chase. (Id. at 26-27.) The air wing lost the SUV, and Agent Toledo called off the chase; however, the black SUV was located and searched within five to ten minutes after the chase was terminated. (Id. at 27:13-24; 71:24-25; 72:22-25; 73:1-14.) No drug paraphernalia was found inside the SUV, but ammunition was found. (Id. at 73:1-14.)

After calling off the black SUV chase, Agent Toledo

4

went to where Defendant was stopped.  When Agent Toledo arrived at Defendant's location, Agent Toledo talked with the officers on the scene and was informed that Defendant had been compliant and provided his driver's license, insurance card, and registration. Additionally, Agent Toledo was told that Defendant was acting nervous.  (Id. at 29:3-10.)

After receiving this information, Agent Toledo approached Defendant and advised Defendant that he was part of an investigation.  (Id.)  Agent Toledo asked Defendant for consent to search his vehicle, but Defendant denied consent.  (Id. at 87:1-10.)  Ten to fifteen minutes after Agent Toledo arrived on the scene, he requested that a drug sniffing dog be brought to the scene.  (Id. at 30:17-25.)  Once Agent Toledo was informed that a dog had been called, Defendant was ordered out of his car, frisked, placed in handcuffs, and placed in the back of a squad car.  (Id. at 89:11-25; 90:1-25.)  Agent Toledo testified that, at this point, Defendant was not free to leave because he was being detained.  (Id. at 90:25; 91:1-7.)

Defendant was detained in the back of the police car for approximately two hours until the K9 unit arrived.[1]  (Id. at 97-99.)  K9 Blackjack arrived at approximately 7:15 p.m. and

---

[1] The two hour delay was due to heavy demands on the police K9 unit due to a visit to Philadelphia by Vice President Biden.  Given the outcome of this motion, the Court need not reach the issue of whether the delay of two hours constituted an impermissible Terry stop.

5

performed an exterior sniff of Defendant's vehicle to which the dog alerted to the smell of narcotics. (Hearing 99:3-20; 101:14-15.) After the car sniff, Agent Toledo sought and received a search warrant for the vehicle. A search of the GMC Envoy was executed and officers uncovered a black briefcase containing cocaine, U.S. currency, cocaine in tupperware, and cocaine in a clear plastic bag. Following this search, Agent Toledo received a search warrant for Defendant's home and executed it that evening. Inside Defendant's home, the officers found a loaded handgun underneath a table, a black bag with $84,600.00, marijuana, crack cocaine, a kilo press, and tires that had been cut off at the rims. After the search of the home, Agent Toledo sought and obtained two federal search warrants for Defendant's bank account and two other cars associated with Defendant.

Before the Court is Defendant's motion to suppress all physical evidence seized from the searches of Defendant's GMC Envoy, his home, his bank account, and the two other automobiles associated with Defendant. Defendant claims that this evidence is the fruit of a prolonged detention unsupported by probable cause.

## III. DISCUSSION

First, the Court will examine whether there was reasonable suspicion or probable cause to initially stop

6

Defendant's vehicle. Then, the Court will examine whether Defendant's initial seizure elevated into an arrest and, if so, whether there was probable cause to support an arrest.

### A. Did the Police Have Reasonable Suspicion to Stop Defendant's Car?

To defeat Defendant's motion to suppress, the Government must prove, by a preponderance of the evidence, that its actions were reasonable under the Fourth Amendment. U.S. v. Matlock, 415 U.S. 164, 178 n.14 (1974). The first issue before the Court is whether the Government's initial stop of Defendant's vehicle violated Defendant's Fourth Amendment rights. "[A] stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that . . . either the vehicle or an occupant' has violated the law." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (quoting Delaware v. Prouse, 440 U.S. 648, 663 (1979)). During a traffic stop, passengers in the car, as well as the driver, are seized for Fourth Amendment purposes. Brendlin v. California, 551 U.S. 249, 255 (2007).

Here, it is undisputed that Defendant was seized when he was pulled over while driving his car. The issue before the Court is whether this seizure was justified by reasonable suspicion. Reasonable suspicion is "'a less demanding standard than probable cause and requires a showing considerably less than

7

preponderance of the evidence.'" U.S. v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). In determining whether there is reasonable suspicion, the Court "must consider 'the totality of the circumstances-the whole picture.'" U.S. v. Sokolow, 490 U.S. 1, 8 (1989) (quoting U.S. v. Cortez, 449 U.S. 411, 417 (1981)). Moreover, the Third Circuit has recognized "that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences, personal observation of suspicious behavior, and information from sources that have proven to be reliable." U.S. v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002) (internal citations omitted). "Courts give considerable deference to police officers' determinations of reasonable suspicion." U.S. v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006).

Agent Toledo testified that he relied on various factors in determining that there was reasonable suspicion to order officers to stop Defendant's vehicle.

### 1. Tip from Confidential Informant

The first piece of information relied upon was a tip "from a proven confidential source indicating that Defendant was selling cocaine out of multiple cars with hidden compartments, specifically including a GMC Envoy with Pennsylvania registration

GMV-5303." (Gov. Brief at 12; see also Hearing 18:22-25; 19:1-11.) Additionally, this confidential source identified where Defendant lived, and that Defendant had recently done federal time for drug trafficking. (Hearing 19:21-23; 21:11-12.) Prior to doing any surveillance, Agent Toledo corroborated this information. Agent Toledo independently investigated whether Defendant had done federal time for drug trafficking, and he investigated what cars were registered to Defendant.[2] (Hearing 21:13-25.)

Defendant attacks the information provided by the confidential source by pointing out that the search warrants for Defendant's GMC Envoy and Defendant's house state that Agent Toledo received this information "approximately 3 months ago." (Gov. Brief at Exhs. 1&2.) Thus, Defendant suggests that the information provided by the confidential source was stale. It is unclear whether the three month benchmark indicates when Agent Toledo began receiving information regarding Defendant Pitts, or if it is the only time Agent Toledo received information regarding Defendant Pitts. Regardless of whether the three month statement indicates when Agent Toledo first received information or the only time he received information, a three month interim

---

[2] The Court record indicates that the information supplied by the confidential source is information that is available to the general public. While this fact may go to the weight and quality of the information, it does not warrant exclusion of the tip from the reasonable suspicion calculus.

would not warrant a finding that the information was stale.

The information provided by the source concerns an activity—drug trafficking—that is of a continuous nature. The Third Circuit has held that the issue of staleness should be construed liberally under certain circumstances such as "when an activity is of a protracted and continuous nature." U.S. v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983). When an activity is "of a protracted and continuous nature the passage of time becomes less significant." Id. Here, the confidential informant indicated that Defendant was a drug trafficker, that Defendant was recently released from federal prison for drug trafficking, and that Defendant drove particular vehicles with hidden compartments. (Hearing 18:11-12.) Based on the continuous nature of this information, Agent Toledo could have reasonably suspected that Defendant was still engaged in the business of drug trafficking. As such, the issue of staleness should be construed liberally in this case.

2. Counter-Surveillance Activity

The second piece of information Agent Toledo relied upon in forming reasonable suspicion is that, during surveillance, Defendant engaged in counter-surveillance activity. Agent Toledo stated that he did not see Defendant drive around the block because he was not following Defendant's car, but the

10

aerial unit was watching the car and reported that Defendant had circled the block. (Hearing 133:1-25.) Agent Toledo stated that he relied upon this information when deciding whether to order officers to stop Defendant's vehicle. (Id. at 134:17-21.)

Defendant offers an innocent explanation for the movement of the car. Defendant suggests that he may have simply been moving his car to a parking spot closer to his house. However, Defendant's innocent explanation for the movement of the car is irrelevant because the issue is whether it was reasonable for Agent Toledo to believe the car was engaging in counter-surveillance activity.

The Supreme Court has held that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Sokolow, 490 U.S. at 9-10 (internal citation omitted). The inquiry is "not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." Id. (internal citation omitted). It was reasonable for Agent Toledo to believe Defendant had engaged in counter-surveillance activity and to attach significance to this belief because this information was reported to Agent Toledo directly from the aerial unit, and Agent Toledo had no reason to disbelieve the information.

### 3. Meeting in Defendant's GMC Envoy

The third piece of information Agent Toledo relied upon were actual observations made by his surveillance unit. Agent Toledo's unit observed Defendant leave his home and drive to a parking lot behind a convenience store. (Hearing 24:1-25; 25:1-25.) Once in the parking lot, the unit witnessed a black SUV park behind Defendant's vehicle. (Id.) The driver of the black SUV exited the vehicle and went to the passenger side of Defendant's vehicle. (Id.) Defendant and the driver of the black SUV met inside Defendant's vehicle for sixteen minutes. The surveillance unit could not see what transpired in Defendant's vehicle because its windows were tinted. However, Agent Toledo testified that based on his training and experience as an undercover drug purchaser, he believed that a drug transaction took place inside Defendant's vehicle. (Id. at 63-65:1-25.)

Defendant suggests that the meeting in his vehicle can only be viewed as an innocent activity. This argument is unpersuasive. See Sokolow, 490 U.S. at 9-10 (stating wholly innocent activity may justify suspicion to believe criminal activity is afoot). Based on all the facts known to Agent Toledo at the time of the meeting in Defendant's car, and Agent Toledo's personal knowledge regarding the manner in which drug deals are performed, it was reasonable for Agent Toledo to attach a

significant amount of suspicion to the Defendant's sixteen minute rendezvous in the Deals parking lot.

    4.   <u>Totality of the Circumstances</u>

"Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . ." <u>Maryland v. Macon</u>, 472 U.S. 463, 470-71 (1985). In this case, the circumstances confronting Agent Toledo include corroborated information from a confidential source, counter-surveillance activity performed by Defendant, and a suspicious meeting in Defendant's car. Based on these facts, the Court finds that Agent Toledo's actions were objectively reasonable. Consequently, the initial stop of Defendant's vehicle was not in violation of Defendant's Fourth Amendment rights.

   B.   <u>Was There Probable Cause to Arrest Defendant?</u>

The next issue before the Court is whether the prolonged detention of Defendant and his car was in violation of the Fourth Amendment. The Court will assess whether the reasonable suspicion that justified the initial stop of Defendant's vehicle elevated to probable cause. "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that

person has committed a felony." U.S. v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (citing U.S. v. Watson, 423 U.S. 411, 421 (1976)). The Supreme Court explained that probable cause is a "fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). The Supreme Court has described the standard for probable cause as such:

> [W]hether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

Beck v. Ohio, 379 U.S. 89, 91 (1964).

The Government argues that the reasonable suspicion justifying the initial stop of Defendant elevated to probable cause when the black SUV, driven by the person Defendant suspiciously met with for sixteen minutes, immediately fled after the meeting when the officers attempted to stop the black SUV. Additionally, the Government points to Defendant's nervousness during the stop as an additional factor that played into Agent Toledo's probable cause calculus. Between the time Defendant's

14

car was legally stopped and the time Defendant was frisked, handcuffed, and placed in the back of the police car these additional factors had come to fruition. (Hearing 26:24-25; 27:1-25; 28:1-25.)

The Court must determine whether these factors, in addition to the information from the confidential informant, the counter-surveillance activity, and the suspicious meeting, are enough to warrant a prudent person to believe Defendant had committed or was committing a drug offense. See Beck, 379 U.S. at 91 (explaining probable cause standard). When making this determination, the Court must take into consideration the fact that "'a police officer may draw inferences based on his own experience in deciding whether probable cause exists,' Ornelas v. U.S., 517 U.S. 690, 700 (1996), including inferences 'that might well elude an untrained person.'" Pennsylvania v. Dunlap, 129 S.Ct. 448 (2008) (quoting Cortez, 449 U.S. at 418).

During the hearing on the motion to suppress, Agent Toledo testified that he has been a task force officer for the Drug Enforcement Administration for three years and, during this time, he has performed numerous undercover drug investigations. (Hearing 11:14-22; 15:1-25.) Agent Toledo explained that based on his training and experience, the black SUV's flight, immediately following the sixteen minute meeting inside Defendant's car, "corroborated [his] suspicion that there was a drug transaction or there was something illegal going on between

15

the [defendant and driver of the black SUV]." (Hearing 26:24-25; 27:1-25; 28:1-25.) Furthermore, Agent Toledo testified that he believed the black SUV fled because "[the driver] had something, either narcotics, money or a gun, and [the driver] may have known [he was] followed from the parking lot." (Id. at 28:20-24.)

The Court finds that a reasonable officer in Agent Toledo's position could reasonably infer that Defendant had engaged in criminal activity when he met with the driver of the black SUV in the Deals parking lot because, immediately following the meeting, the driver of the black SUV fled after being pursued by the police. It is true that mere proximity to a suspicious companion who has created "his own" probable cause does not, without more, impute the probable cause to the other. Ybarra v. Illinois, 444 U.S. 85, 91 (1979).[3] However, proximity to a

---

[3] In Ybarra, law enforcement officers received information from an informant indicating that a certain bartender was selling heroin while working at a particular bar. 444 U.S. at 88. Officers obtained a search warrant authorizing the search of the bartender and the bar where he worked. Id. When executing the warrant, officers did a patdown of Ybarra, a bar patron. Id. During this patdown, officers found heroin on Ybarra. Id. at 89. Defendant Ybarra was indicted with unlawful possession of a controlled substance. Defendant Ybarra filed a motion to suppress, and the Supreme Court granted the motion. The Supreme Court held that the search of Ybarra violated his Fourth Amendment rights because he had made no suspicious statements nor any gestures indicative of criminal conduct. Id. at 91. Moreover, the agents executing the warrant "knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe the bartender would have heroin for sale." Id. The Court stated that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ." Id. (emphasis

16

suspicious individual plus other relevant circumstances may create probable cause.[4]  Additionally, while nervousness alone is

---

added).  The case before the Court differs from Ybarra because, in this case, there are many circumstances, in addition to Defendant's companion's flight, that factor into the probable cause calculus.

   [4] In U.S. v. Tehrani, et al., 49 F.3d 54 (2d Cir. 1995), the United States Court of Appeals for the Second Circuit held that under certain circumstances "reasonable suspicion created by one person can 'taint' another individual."  49 F.3d at 59.  Factors that must be considered are "(1) the nature of the place in which the intrusion occurred, that is public or private, and (2) whether the individual himself was behaving suspiciously or whether he was tainted by the behavior of another."  Id. (citing U.S. v. Jaramillo, 25 F.3d 1146, 1151-53 (2d Cir. 1994)).  In Tehrani, the Defendant argued that although the officers had reasonable suspicion as to his co-defendant, Tehrani, they did not have reasonable suspicion as to Defendant.  Id.  The court held that the information the officers had about the Defendant — that he was traveling with a person who had refused to provide identification, lied about how he entered the country, and was hostile during questioning, together with Defendant's inability to say how he had entered the country — "provided an adequate basis for the officials to reasonably believe Defendant was not just a mere innocent . . . companion but was . . . acting in concert with [co-defendant Tehrani]."  Id. at 60; see also U.S. v. Eighty Thousand Six Hundred Thirty-Three Dollars, 512 F. Supp. 2d 1196, 1205 (M.D. Ala. 2007) (holding that flight of Defendant's companion factored into probable cause analysis which justified the search and seizure of Defendant's carry-on bags).
   In Eighty Thousand, Defendants Coleman and Merritt were traveling together to San Antonio, Texas.  512 F. Supp. 2d at 1199.  A large amount of cash was found in Defendant Merritt's carry-on bag.  Id. at 1200.  Defendant Merritt was escorted to the police office.  Id.  Meanwhile, officers were ordered to retrieve Defendant Coleman and bring him to the police office. Id.  While being escorted to the police office, Defendant Coleman twice attempted to flee.  Id.  In determining whether there was probable cause to seize the cash found in Defendant Merritt's bag the court stated that the "reasonable suspicion of Merritt and his cash ripened into probable cause to seize the cash when Coleman twice attempted to flee."  Id. at 1206.  The court went on to state that the exigencies of the situation "including unknown but potentially harmful substances yet uncovered . . ., as well as the likelihood of the disappearance of the cash if the

17

insufficient to establish probable cause, it too can be considered as part of the probable cause calculus. <u>Florida v. Royer</u>, 460 U.S. 491, 507 (1983). Here, the factors which gave rise to reasonable suspicion–i.e., the tip from the informant, the counter-surveillance activity, the sixteen minute meeting in Defendant's car—plus the companion's flight immediately after the meeting in Defendant's car, as well as Defendant's visible nervousness upon contact with the police, when viewed together give rise to probable cause. Consequently, Agent Toledo had probable cause to arrest Defendant without a warrant and detain Defendant until arrival of the K9 unit.

Defendant argues that "the K9 'sniff test' as conducted was the product of the defendant's illegal stop and detention." (Def.'s Brief at 8.) However, given that the Court finds that the Defendant was arrested based on probable cause, this argument fails. Accordingly, all evidence seized from the search of Defendant's car is admissible. Similarly, to the extent this evidence was referenced in the affidavit supporting the application for a warrant to search Defendant's house, all evidence found within the house is admissible because the "tree" was never poisonous.

---

men were released, compelled seizure of the cash and a thorough completion of the searches of both carry-on bags." <u>Id.</u>; <u>see</u> <u>also</u> <u>Husty v. U.S.</u>, 282 U.S. 694, 701 (1931) (determining probable cause existed based on corroborated information and companions' attempt to escape when officers pulled Defendant's car over).

**IV. CONCLUSION**

Based on the aforementioned, Defendant's motion to suppress will be **DENIED**.